

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BENNETT EVANS, | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:15-CV-02224-KOB |
| | ) | |
| NANCY BERRYHILL | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On September 21, 2012, the claimant, Bennett Evans, protectively applied for
disability and disability insurance benefits under Title II and part A of Title XVIII of the
Social Security Act. (R. 145). The claimant initially alleged disability commencing on
June 16, 2012 because of coronary artery disease, cervical spine disease, depression, acid
reflux, insomnia, glaucoma, and cataracts. (R. 145, 184). The Commissioner denied the
claim on December 26, 2012. (R. 87). The claimant filed a timely request for a hearing
before an Administrative Law Judge, and the ALJ held a hearing on January 22, 2013.
(R. 95).

In a decision dated May 1, 2014, the ALJ found that the claimant was not disabled
as defined by the Social Security Act and was, therefore, ineligible for social security
benefits. (R. 7-28). On October 6, 2015 the Appeals Council denied the claimant's

requests for review. (R. 1-4). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c) (3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUE PRESENTED

The issue before the court is whether, under the Eleventh Circuit's pain standard, the ALJ properly assessed the claimant's subjective complaints of disabling pain.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if the ALJ applied the correct legal standards and if substantial evidence supports the ALJ's factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of

vocational factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d) (1) (A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. § 423(d) (1) (A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

## V. FACTS

The claimant was fifty-four years old at the time of the ALJ's final decision. (R. 34). The claimant has a twelfth grade education and past relevant work as a shredder, delivery driver, produce clerk, and material handler. (R. 62, 185). The claimant alleges disability based on coronary artery disease, cervical spine disease, depression, acid reflux, insomnia, glaucoma, and cataracts. (R. 184).

*Physical and Mental Impairments*

On September 6, 2005, the claimant visited the University of Alabama at Birmingham emergency room because a heavy tire fell while the claimant was working, hitting him in the chest. On the same day, Dr. Tom McElderry, a cardiologist, diagnosed the claimant with a chest wall contusion and hypertension. Dr. McElderry referred the

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

claimant to the Kirklin Clinic for further hypertension evaluation after discharge.[2] (R 269-74, 279).

At the recommendation of his emergency room doctors, the claimant visited the Birmingham Veteran's Association Medical Clinic to establish primary care on November 30, 2005. During this initial visit, nurse practitioner Jennifer Dardy-Bonner determined that the claimant still suffered from hypertension and diagnosed the claimant with gastroesophageal reflux disease (gerd). She prescribed a blood pressure regimen consisting of Ramipril, Felodipine, and HCTZ to stabilize his hypertension, and Omeprazole for his gerd. (R. 1108-1112).

During his yearly follow-up at the VA on August 24, 2006 with Dr. Felicia R. Noerager, the claimant's hypertension and gerd were both controlled. Similarly, on January 4, 2007, the claimant's hypertension and gerd were stable; however, Dr. Noerager sent the claimant to the emergency room because of an abnormal EKG. Ultimately, all emergency room tests and evaluations were normal. (R. 1095-97, 1102).

The claimant continued to see Dr. Noerager for two yearly follow-up appointments, and the claimant's hypertension and gerd remained controlled until 2009. On February 27, 2009, Dr. Noerager reported that the claimant's hypertension was poorly controlled because of his failure to consistently take prescribed medications. Dr. Noerager also prescribed Ibprofin for claimant's new hip and back pain complaints. Similarly, during a September 15, 2009 follow-up, the claimant stated that he no longer took hypertension and gerd medication, but continued to experience chest pain. (R. 1025, 1029).

---

[2] The court can find no record from the Kirklin Clinic immediately after this visit; however, the claimant did visit the Kirklin Clinic in August 2012. (R. 280).

On April 27, 2010, the claimant received a Kenalog shot and a Lortab perscription for back pain, and Dr. Noerager ordered an MRI of the claimant's back. Dr. Noerager also reported that the claimant's hypertension and gerd were again stabilized with medication. An MRI of the claimant's back taken on May 18, 2010 showed narrowing of the claimant's spinal column.  (R. 1003-05, 1011).

The claimant called the VA on October 13, 2011 to renew his hypertension, gerd, and pain medications; however, the medical clinic, not having seen the claimant in over a year, did not have authorization to renew. Subsequently, on December 8, 2011, the claimant visited Dr. Noerager for his yearly follow-up. During this appointment, Dr. Noerager ordered x-rays and a stress test, and prescribed tramadol for the claimant's chest pain. The claimant's hypertension and gerd both continued to remain stable. (R. 989-90, 1102).

In a letter dated December 13, 2011, Dr. Noerager notified the claimant that the x-rays showed no abnormalities. Similarly, after a nuclear cardiac stress test conducted on January 20, 2012, Dr. Noerager sent another letter notifying the claimant that the stress test was also normal. (R. 981-86).

On April 18, 2012, the claimant called the VA hospital complaining of chronic pain. Dr. Noerager scheduled a follow-up appointment to address this pain on April 24, 2012. During the appointment, Dr. Noerager diagnosed the claimant with hematuria and lipoma, ordered an MRI, and prescribed Roboxin, Tramadol, and Gabapentin for lower back pain. (R. 976-980)

The claimant underwent the MRI on June 1, 2012. During the MRI follow-up on June 5, 2012, Dr. Noerager diagnosed the claimant with spinal stenosis and lipomatosis

caused by mild central canal narrowing and cord compression at C6-C7, and referred the claimant to the VA neurosurgeon. Before the neurology consultation, however, the claimant was admitted to the intensive care unit and diagnosed with angina on June 17, 2012. (R. 943, 972-73).

The claimant remained in the hospital for three days. On June 18, 2012, the claimant underwent an angiography and cardiac catheterization surgery to place a heart catheter and stent in the claimant's coronary artery. Although the angina was ultimately unresolved, the treating physician prescribed Plaviz and Lisinopril and discharged the claimant on June 19, 2012. During the claimant's June 28, 2012 emergency room follow-up, Dr. Noerager reported no substantial changes regarding his hypertension, gerd, chest pain, lower back pain, hematuria, or lipoma. (R. 877-78, 906, 925).

Upon Dr. Noerager's referral, the claimant also visited Dr. Carin Eubanks at the VA the mental health department on June 28, 2012. Dr. Eubanks diagnosed the claimant with moderate psychological distress and recommended future treatment, but the claimant refused further treatment. (R. 876-77).

On July 17, 2012, the claimant visited Dr. Gilbert J. Perry at the VA Cardiology Clinic to follow-up on his cardiac surgery. Dr. Perry reported that the claimant's hypertension was controlled, and referred the claimant to cardiac rehab. (R. 862-64).

During his yearly follow-up on August 7, 2012, Dr. Noerager stated that the claimant's hypertension was controlled; however, his gerd was not improving because he no longer took his medication. She noted that the claimant needed to stop any activity causing chest pain, and that he should not return to work until early September 2012 after

cardiac rehab. On the same day, the claimant underwent a GXT echocardiogram to evaluate chest pain that showed no abnormalities. (R. 848, 855).

The claimant visited the Kirklin Clinic at UAB Health Center – Hueytown on August 14, 2012. During this initial visit, Dr. Jonathan D. Mize suggested the claimant continue his current blood pressure medication, and gave the claimant a detailed meal plan. (R. 280).

On August 23, 2012, the claimant enrolled in cardiac rehab at Spain Rehab Center. He attended two cardiac rehab sessions before his first visit with the VA neurosurgeon Dr. Kimberly P. Kicielinski. After a general consultation on August 28, 2012, Dr. Kicielinski recommended the claimant continue cardiac rehab and discuss occupational therapy with his primary physician before any potential spinal surgeries are discussed further. (R.303-04, 841-42).

The claimant attended five more cardiac rehab sessions before a cardiac follow-up with Dr. Perry on September 11, 2012. The claimant asserted that he felt his physical endurance was improving; however, Dr. Perry did not report any significant health changes and recommended the claimant continue cardiac rehab. (R. 306-14, 840).

On September 17, 2012, the claimant called Dr. Noerager's office requesting to stay off work until he completed cardiac rehab. After reviewing the phone call, Dr. Noerager concluded that she needed more information before agreeing to the note. Before Dr. Noerager could gather that information, though, the claimant visited Dr. Perry on September 19, 2012 for a formal clearance to return to work as a truck driver. Dr. Perry wrote a letter to the claimant's company clearing the claimant to drive from a cardiovascular standpoint, but restricting lifting until cleared by a neurosurgeon, and

restricting lifting to twenty-five pounds after a neurosurgical clearance. Dr. Perry also opined that cervical or lumbar spine surgery would have to wait approximately twelve months until the stent in the claimant's heart could be removed. (R. 833-35).

The claimant attended his yearly check-up at the VA on October 15, 2012. Dr. Therese Mays noted no changes to the claimant's medical report. Similarly, at a neurology follow-up on November 6, 2012, the claimant told Dr. Joshua York Menendez that he had not fully engaged in cardiac rehab, and that he continued to experience chest pain and shortness of breath while walking. Dr. Menendez noted no medical changes and recommended that the claimant continue cardiac rehab before following up for additional neurological remedies. (R. 806, 818-19).

The claimant submitted a function report and cardiovascular questionnaire to the Social Security Administration on October 22, 2012. He explained that he walks around his block two to three times a week, and walks on a treadmill and rides a bike at cardiovascular therapy. He also stated that he does laundry on occasion, and sometimes drove himself to therapy or to church. (R. R. 211-225).

On November 30, 2012, the claimant went to the VA emergency room with the chief complaint that he hurt all over. He remained hospitalized for three additional days, and underwent another cardiac catheterization operation. He was diagnosed with hemorrhoids, but doctors noted no echocardiogram or other cardiac changes, and the claimant was ultimately discharged on December 3, 2012. (R. 707, 724, 790-92).

The claimant returned to his primary doctor at the VA for a follow-up on December 11, 2012, where Dr. Noerager noted his controlled hypertension. Dr. Noerager also noted the claimant's back pain and deteriorating arm strength, and expressed the

claimant's need for back surgery. Dr. Noerager also ordered an abdominal and pelvis CT scan because of an enlarged prostate. (R. 1145-47).

The claimant attended his first psychotherapy session at the VA on December 14, 2012 with Dr. Lindsey Moore. Dr. Moore noted that the claimant experienced a significant level of psychological distress, and requested the claimant return at the end of the month. (R. 1138-40).

On December 21, 2012, the claimant called Dr. Noerager's office to request an Oxycodone and Clonzepam refill. Dr. Noerager declined to prescribe Oxycodone and Clonzepam, but instead perscribed Percocet for pain. Again, on January 18, 2013, the claimant called to renew his pain medication.[3] (R. 1494, 1506-07).

The claimant attended another psychotherapy treatment session with Dr. Moore on December 31, 2012. During this meeting, Dr. Moore recommended the claimant continue seeing Dr. Noerager, and suggested he continue psychotherapy treatment to discuss coping mechanisms. Subsequently, the claimant attended two additional psychotherapy sessions in January 2013.

Because of abnormal CT results, the claimant underwent flexible cystourethroscopy surgery on January 28, 2013 at the VA to evaluate at the claimant's bladder for disease, which yielded no abnormalities. On February 5, 2013, the psychotherapy treatment department at the VA noted the claimant's stable mental state. Then, on February 11, 2013, the claimant again called Dr. Noerager to refill his pain medication. (R. 1476, 1486).

---

[3] The medical record states that Dr. Noerager's office received the request, but does not specify whether Dr. Noerager granted the request.

During his yearly check-up at the VA on February 15, 2013, Dr. Noerager noted that the claimant's gerd was getting worse, so she referred him to a gastroenterologist to further analyze the claimant's non-improving gerd. Lastly, Dr. Noerager and the claimant discussed increasing the claimant's Percocet dosage or switching to Morphine for pain treatment. The claimant did not want to switch to Morphine, so Dr. Noerager agreed to prescribe more Percocet for the claimant's chronic back pain. (R. 1471).

On March 3, 2013, the claimant visited Dr. Michael Passarella in the VA's gastroenterology department at Dr. Noerager's request. Dr. Passarella conducted a barium swallow test and ordered an esophagogastroduodenoscopy procedure to test for dysphagia. During his follow-up on March 4, 2013, Dr. Passarella notified the claimant that the barium swallow yielded a mild gerd diagnosis. The claimant again requested more pain medication from Dr. Noerager on April 3, 2013.[4] (R. 1452, 1459, 1465).

In April 2013, the claimant attended two additional psychotherapy sessions at the VA, when he discussed mental health issues arising from his health problems; however, Dr. Moore did not note any significant changes in mental health, and planned to continue discussing coping mechanisms.

The claimant underwent an esophagogastroduodenoscopy with possible interventions procedure on April 28, 2013 to examine and treat esophagus, stomach, and upper intestinal issues. On May 6, 2013, the claimant re-requested pain medication from Dr. Noerager.[5] Subsequently, during the procedure follow-up appointment on May 13,

---

[4] The medical record states that Dr. Noerager's office received the request, but does not specify whether Dr. Noerager granted the request.
[5] The medical record states that Dr. Noerager's office received the request, but does not specify whether Dr. Noerager granted the request.

2013, Dr. Passarella noted that the bowel biopsies were normal; however, he diagnosed the claimant with dysphagia, and ordered a CT scan and pre-creatinine. (R. 1571, 1582).

On August 30, 2013, Dr. Barton Guthrie at the VA performed a C6-C7 anterior cervical discectomy with fusion on the claimant's back. The claimant noted improvement in his left upper extremity after surgery, and was discharged that same day. (R. 1539).

Dr. Noerager ordered physical therapy to treat the claimant's continued back pain on October 25, 2013. The order specified that the therapy should be conducted two times per week for six weeks, and gave no medical precautions. The claimant scheduled four appointments between October 30, 2013 and December 9, 2013; however, the therapy department discontinued because the claimant failed to show up to two of the four appointments. (R. 1544-46).

A post-surgery MRI of the claimant's back on December 3, 2013 revealed degenerative changes involving the facet joints, lateral recess stenosis at L2-3 and L3-4 without definite nerve root compression, left forminal stenosis at L4-5, and nerve root compression in the roof of the neural foramen. (R. 1516-17).

The claimant again visited the VA emergency room on December 10, 2013 with complaints of chest pain. The attending physician, Dr. Thomas Stewart Huddle determined that, because three sets of cardiac markers were negative and his echocardiogram was normal, the claimant's chest pain was likely musculoskeletal. The emergency room discharged the claimant without a new diagnosis on December 11, 2013. (R. 1536-1538).

On December 17, 2013, Dr. Noerager submitted another order for physical therapy. The order specified that physical therapy should take place two times per week

for six weeks with no medical precautions. She noted that physical therapy was previously discontinued because the claimant was hospitalized, and explained that he needed physical therapy before his neurosurgeon would schedule a follow-up. The claimant scheduled nine appointments between December 19, 2013 and February 12, 2014. The physical therapy department cancelled two of the nine appointments for administrative purposes; however, the claimant cancelled one appointment and did not show up to three of the nine appointments. The physical therapy department again discontinued treatment per hospital policy. (R. 1542-44).

Finally, during a cardiology follow-up on February 18, 2014, the claimant underwent a GXT echocardiogram and x-rays, and all results were normal. Then, after the claimant asserted that he could walk one and a half miles in twenty minutes without significant difficulty, the cardiologist also concluded that the claimant's chest pain was unlikely heart related. The cardiologist also noted that the claimant's musculoskeletal exam yielded full range of motion, no joint effusion or crepitus, and no CCE. (R. 1547).

### The ALJ Hearing

At the hearing on October 23, 2013, the claimant testified that he lives at home with his wife, eighteen-year-old daughter, and thirteen-year-old son. He testified that if he is not laying around at home, he tries to walk around his neighborhood and do streatching exercises. He stated that he tries to walk two miles; however, he often has to stop and finish later. (R. 35-36).

The claimant further testified that he could no longer drive after his neck surgery on December 30, 2013. He stated that the last road trip he took was to New York for his

brother's funeral November 2013. He explained that the trip took twelve to thirteen hours; however, he did not drive at all during the trip. (R. 38-39).

The claimant testified that his son used to play basketball, and his daughter used to play track. He stated that he would attend every game and track meet they were involved in. He also testified that he would often drive them to practice prior to his neck surgery. (R. 39-40).

When questioned about unemployment, food stamps, and health insurance, the claimant explained that he did not qualify for them. He could not afford to add himself to his wife's health insurance; however, he does receive health coverage at the VA hospital. He testified that from June to October 2012 he received Aflac short term disability, but no longer receives any type of worker's compensation. (R. 40-42).

The claimant testified that he stopped working because of his heart condition, and he cannot work any longer because of his inability to lift more than eight pounds and shortness of breath. He also stated that he has mental impairments that keep him from working and that he does not take care of anyone while staying at home. (R. 42-46, 48).

When asked if he smoked or drank alcohol, the claimant explained that he did in the past, but he stopped after he underwent heart surgery in 2012. He also stated that he only took illegal drugs in high school, and no longer uses them. (R. 47-48).

The claimant testified that prior to his neck surgery he would have rated his pain as a ten on a scale from zero to ten. He also stated that prior to heart surgery he did not know he had an issue with his heart. He explained that he was experiencing pain everywhere but did not know why and would consistently complain to his supervisor. (R. 51-52).

14

When asked about prior work, the claimant testified that he had been a truck driver for Tyson Shared Services in 1999. This job did not require the claimant to lift, as he was hauling livestock. In 2000, the claimant testified that he was a meat separator, which required him to lift and transfer approximately eighty pounds of groceries from a cooler to a truck. Then, in 2001, he pulled stock on pallets using a go-cart to transfer the stacks to the trucks or into the grocery store. From 2001-2003, he delivered wine from a delivery truck, which required him to lift approximately one-hundred pounds at every stop. Next, from 2004-2006, the claimant worked as a shredder for EnviroShred and Bruce Office Supply. Finally, in 2007, the claimant went back to driving trucks and delivering wine. (R. 57-61).

A vocational expert, Dr. Jewel Elizabeth Bishop Euto, testified concerning the type and availability of jobs that the claimant was able to perform. Dr. Euto testified that the claimant's past relevant work was as a shredder, a delivery driver, a produce clerk, and a material handler. Dr. Euto classified the shredder position as medium and unskilled work; the delivery driver position as medium and semi-skilled work; the produce clerk position as medium and unskilled work; and the material handler position as heavy and semi-skilled work. (R. 62).

The ALJ asked Dr. Euto to assume that a hypothetical individual with the same age, education, and work experience as the claimant is limited to light work with occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; no climbing ladders or scaffolds; occasional bilateral overhead reaching; no exposure to extreme cold, heat, fumes, dust, gases, poor ventilation, or vibration; and no hazardous machinery or unprotected heights. Dr. Euto stated the hypothetical individual

15

could not perform the claimant's previous work. The ALJ asked Dr. Euto if other jobs existed in the region or nation that the individual could perform. Dr. Euto replied that the hypothetical individual could perform work as a counter clerk, classified as light exertion, and unskilled work, with 8,500 jobs in Alabama and 432,650 jobs in the nation; usher, classified as light exertion, unskilled work, with 1,750 jobs in Alabama and 106,650 jobs in the nation; and rental clerk, classified as light exertion, unskilled work, with 8,550 jobs in Alabama and 432,750 in the nation. (R. 62-63).

The ALJ then added an additional limitation requiring the hypothetical person to alternate between standing and sitting every thirty minutes to an hour while being on task, and asked if the same jobs would remain available. Dr. Euto testified that the same jobs would remain available, with a reduction in numbers by fifty percent. (R. 64).

The ALJ then changed the hypothetical to include an individual who can perform simple tasks for two hours at a time with normal breaks, and can only tolerate infrequent changes in the workplace introduced gradually when necessary. The ALJ asked if the individual would be able to perform any jobs. Dr. Euto replied that the hypothetical individual could perform work as a bench assembler, classified as light exertion, and unskilled work, with 1,800 jobs in Alabama and 218,700 jobs in the nation; a sorter, classified as light exertion, unskilled work, with 375 jobs in Alabama and 39,050 jobs in the nation; and an inspector, classified as light exertion, unskilled work, with 7,100 jobs in Alabama and 454,010 in the nation. (R. 64-65).

Again, the ALJ added an additional limitation of sedentary work, and asked if the claimant in this case had acquired any skills in his past relevant work that would transfer to jobs at a sedentary exertion level. Dr. Euto testified that the claimant has not acquired

16

the required skills. (R. 65).

Then, the ALJ went back to the first three proposed hypotheticals, and asked whether the jobs would remain if the individual would be off task for ten percent of the day. Dr. Euto stated that the jobs would remain the same. The ALJ then increased the percentage to fifteen percent, and asked if the jobs would remain the same. Dr. Euto testified that fifteen percent of the day would be excessively off task and would preclude all work activity. (R. 65-66).

Finally, the claimant's counsel proposed a final adjustment to the hypothetical when he asked if any jobs would be available to the described individual if the individual was required to recline two to three hours in a workday. Dr. Euto stated that this adjustment would preclude all work activity; however, she described this hypothetical as abnormal because of potential future surgeries. Dr. Euto expressed concern that frequent surgery would affect reliability and excessive absenteeism. (R. 66-68).

*The ALJ's Decision*

On May 1, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since his June 16, 2012 alleged onset date. (R. 12).

Next, the ALJ found that the claimant had the severe impairments of coronary artery disease status post stent; hypertension; degenerative disc disease of the lumbar spine; degenerative disc disease of the cervical spine; and adjustment disorder with both depressed and anxious mood. The ALJ found the claimant's gerd to be non-severe after

reviewing two EGDs that revealed a normal esophagus and only mild chronic gastritis results, and two barium swallows that yielded only mild results. The ALJ explained that doctors increased the claimant's medication, and that the subsequent treatment records do not support ongoing symptoms that would cause more than a minimal limitation to the claimant's working ability. (R. 12-13).

Similarly, the ALJ stated the claimant's hematuria was confirmed by lab work, however a CT scan did not render a cause, and the claimant was not treated for his impairment, so the record does not support symptoms that would cause more than minimal limitations. Additionally, the ALJ did not find any record to show treatment for a cataract or ongoing symptoms of a visual impairment, and the claimant's hemorrhoids were managed with warm soaks, rendering them nonsevere. (R. 13).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for listing 1.04 concerning a disorder of the spine. To meet this listing, the claimant would have to demonstrate evidence of nerve rood compression in a neuro-anatomic distribution with motor, sensory, or reflex loss, or spinal arachnoiditis confirmed by operative note or pathology report or lumbar spinal stenosis resulting in pseudoclaudication with an inability to ambulate effectively. The ALJ noted that the claimant did not tender such evidence. (R. 14).

Additionally, the ALJ considered whether the claimant met the requirements of listing 4.00 and 4.06, requiring evidence of the required levels of cardiac enlargement, congestive heart failure or of a vision, kidney, or neurological impairment. The ALJ

18

explained that the evidence does not support the level of occlusion of arteries resulting in a serious limitation in the ability to initiate, sustain, or complete activities or daily living required by these listings. (R. 14).

The ALJ also considered whether the claimant met the criteria for listing 12.04 and 12.06 "paragraph B" concerning mental impairments. To meet this listing, the claimant would have to demonstrate that the mental impairments result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ noted that based on the claimant's reported daily activities and social functioning, such as doing laundry, driving, attending church, and ability to pay attention and follow instructions, his mental impairments did not cause at least two "marked" limitations or one "marked" limitation. (R. 14-15).

Additionally, the ALJ considered whether the claimant met the requirements of "paragraph C," requiring evidence of episodes of decompensation, potential episodes of decompensation, or the inability to function outside a highly supportive living arrangement. The ALJ determined that the claimant has experienced no episodes of decompensation, and no evidence showed a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the claimant to decompensate. (R. 15).

Next, the ALJ determined that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: occasional balancing, stooping, kneeling, crouching, crawling, and climbing

ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional bilateral reaching overhead; no concentrated exposure to extreme cold, heat, fumes, dust, gases, poor ventilation, or vibration; and no hazardous machinery or unprotected heights. The claimant must be able to alternate between standing and sitting every thirty minutes to one hour while remaining on task. Mentally, the claimant is able to understand, remember, and carry out unskilled, simple tasks for two hours at a time with normal breaks; and have casual contact with coworkers, supervisors, and the public. The claimant is limited to an environment where changes are infrequent but, when necessary, are introduced gradually. (R. 16).

In making this finding, the ALJ considered the claimant's symptoms and the corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause his symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. (R. 17).

First, the ALJ considered the claimant's coronary artery disease allegations in light of the medical record. She discussed the angiography the claimant underwent on June 18, 2012, which showed severe proximal left anterior descending artery disease, but no obstructive coronary artery disease. The ALJ noted that post procedure stenosis was improved, and a follow-up stress test on August 7, 2012 was normal. (R. 17).

The ALJ then looked to the cardiac rehabilitation notes to show that the claimant's cardiac issues were improving. The ALJ stated that on August 2012, tests showed no cardiac issues or symptoms, and the claimant expressed that his endurance

was improving. Then, on November 6, 2012, the claimant told his neurologist that he had not fully engaged in cardiac rehab, and that he continued to have chest pain while walking and to be short of breath. The ALJ noted that on that same day, the claimant's cardiologist noted that his coronary artery disease and hypertension were stable. (R. 17).

The ALJ explained that the claimant's chest plain was frequently dismissed as non-cardiac related. For example, the ALJ looked to the November 30, 2012 emergency room visit, during which cardiac catheterization showed a stable stent and no obstructive disease. The ALJ noted that after four days of being monitored, the hospital discharged the claimant with his previously prescribed cardiac medication, and doctors noted that the chest pain was likely musculoskeletal in nature. (R. 17).

Similarly, the ALJ looked at the claimant's emergency room visit on December 10, 2013. The ALJ noted that the cardiac markers were all negative and that the treating physician again thought the chest pain was a musculoskeletal problem. Then, the ALJ looked at the follow- up appointment on February 18, 2014, when the claimant's cardiologist opined that the claimant's chest pain was unlikely heart related. (R. 18).

Second, the ALJ considered the claimant's degenerative disc disease allegations in light of the medical record. The ALJ began by referencing the claimant's June 1, 2012 MRI, which revealed mild central canal narrowing and cord compression at C6-C7. She then compared the June MRI with an MRI taken on December 3, 2013 and an x-ray taken on February 18, 2013 to show only minimal degenerative progression. (R. 18).

The ALJ pinpointed December 2012 as the month the claimant began experiencing slightly reduced grip in his hands. The ALJ stated that the claimant ultimately underwent a C6-C7 anterior cervical discectomy with fusion on August 30,

2013; however, the claimant maintained full range of motion during his cardiology follow-up on February 18, 2014. (R. 18).

While the objective evidence does reveal abnormalities, the medical findings do not support the degree of debilitation alleged. For example, the ALJ noted that the MRI's taken do show significant changes in the cervical spine; however, the claimant's strength over time has only decreased slightly. Similarly, although the MRI's revealed some nerve root compression, the claimant ambulated normally.  (R. 19).

The ALJ then considered the claimant's daily activities and determined that, because the claimant reported that he mowed his lawn two weeks after heart surgery, walks approximately 2 miles several times per week, attended his children's sporting events, and recently took a thirteen-hour road trip from Alabama to New York, his daily activities support light work capabilities. Furthermore, the ALJ noted that the claimant's cardiologist released him back to work, as long as he only performed the equivalent of light work. Similarly, the ALJ stated that the neurosurgeon who performed the claimant's spinal surgery opined that the claimant could engage in activity as tolerated, but should not participate in strenuous activity. The ALJ determined that these factors undermine allegations of the severity and frequency of the claimant's symptoms. (R. 21-22).

Finally, the ALJ, relying on the vocational expert's testimony, found that the claimant is unable to perform any of his past relevant work. The ALJ determined that based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, jobs existed in significant numbers in the national economy that the claimant could perform. (R. 23).

## VI. DISCUSSION

22

The claimant argues that the ALJ improperly discredited the claimant's subjective complaints of pain and characterizations of his physical limitations. To the contrary, this court finds that substantial evidence supports the ALJ's findings and that she applied the appropriate legal standards to her evaluation of the claimant's subjective complaints and allegations of pain.

A Commissioner evaluating a claimant's pain and other subjective complaints must first consider whether the claimant demonstrated an underlying medical condition. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.  If the claimant demonstrates an underlying medical condition, the Commissioner must then determine if any objective medical evidence confirms the severity of the alleged pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to give rise to the alleged pain. *Holt*, 921 F.2d at 1223. Subjective testimony can satisfy the pain standard if the testimony is supported by objective medical evidence. *Foote v. Chater,* 67 F.3d 1553, 1561(11th Cir. 1995).

The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Foote*, 67 F.3d at 1561-62; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The reasons articulated for discrediting the claimant's testimony may include the claimant's daily activities. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). However, if the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236.

On March 16, 2016, the Social Security Administration issued a Notice of Social Security Ruling, which provides guidance and clarification on how to evaluate claimant

statements about "the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI . . . and blindness claims under Title XVI of the Act." SSR 16-3p, 81 Fed. Reg. 14166-01 (Mar. 16, 2016). Concerned that subjective evidence was being viewed in light of the claimant's personal character, the Social Security Administration clarified the two step pain standard, eliminating the term "credibility," and delineating that evaluation of subjective evidence is not an analysis of the claimant's character:

> Step 1: We Determine Whether the Individual Has a Medically Determinable Impairment (MDI) That Could Reasonably be Expected to Produce the Individual's Alleged Symptoms . . . Step 2: We Evaluate the Intensity and Persistence of an Individual's Symptoms Such as Pain and Determine the Extent to Which an Individual's Symptoms Limit His or Her Ability To Perform Work-Related Activities for an Adult or To Function Independently, Appropriately, and Effectively in an Age-Appropriate Manner for a Child With a Title XVI Disability Claim.

*Id*. (emphasis omitted).

The Social Security Administration did not explicitly deem this ruling retroactive, and neither the Eleventh Circuit nor any district court within it has addressed the ruling's retroactivity. *See Hargress v. Berryhill*, No. 4:16-cv-1079-CLS, 2017 WL 588608, at *2 (N.D. Ala. Feb. 14, 2017) (stating that "[t]he retroactivity of the Rule has not been directly addressed by any Circuit Court of Appeals, or by any district court within this Circuit."). However, even if the court applied SSR 16-3p retroactively, the ALJ did not violate it in this case. *See id*. (explaining that "[e]ven though the ALJ used the word 'credible,' he did not assess claimant's *general*, or 'overall' character or truthfulness."). Although the ALJ in this case used the term "credible" throughout the opinion, she did not use the term to assess the claimant's character. The ALJ properly analyzed the

claimant's subjective evidence in light of the objective medical evidence to determine that the subjective evidence was not medically supported.

Furthermore, the ALJ properly articulated her reasons for finding that the claimant's testimony about his pain and characterization of his physical capabilities do not warrant a disability. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 17).

The ALJ set forth several reasons for finding the claimant's allegations inconsistent with the evidence. She found that the objective medical evidence conflicted with the claimant's allegations. When evaluating the alleged pain caused by coronary artery disease in light of the medical record, the ALJ explained that not only were the claimant's cardiac issues improving over time, the chest pain the claimant complained of was not cardiac related. The ALJ pointed to two emergency room visits, during which treating physicians noted that the chest pain was likely musculoskeletal in nature. Furthermore, the claimant admitted that he could walk one and a half miles in less than twenty minutes without significant difficulty. (R. 17-18).

The ALJ then considered pain allegations caused by degenerative disc disease in light of the medical record to determine that the claimant's allegations do not withstand objective medical evidence. (R. 19). The ALJ compared the first MRI taken on June 1, 2012 to the MRI taken on December 3, 2013 after the claimant's spinal fusion to determine that there was only minimal degenerative progression. Then, the ALJ outlined the multiple occasions the claimant complained of back pain, and pointed to the record to

indicate that the claimant maintained full strength, sensation, reflexes, and range of motion throughout the entire timeline. Most notably, the ALJ references the August 30, 2013 spinal fusion, and although the ALJ points out that the post-surgery medical record is sparse, the record shows that the claimant maintained full range of motion during his cardiology follow-up on February 18, 2014. (R. 18).[6]

The ALJ also considered the claimant's daily activity characterizations. The ALJ pointed out that the claimant reported to have mowed his lawn only two weeks after heart surgery, and that that he consistently walks around his neighborhood without significant difficulty. She also noted that the claimant attended every one of his children's sporting events, often transporting them to practice, and recently took a thirteen-hour road trip from Alabama to New York. (R. 21)

Lastly, the ALJ referenced two significant medical records implying that the claimant is capable of performing light work. First, the ALJ noted that the claimant's cardiologist released him back to work, restricting him to the equivalent of light work. Second, his neurosurgeon allowed him to engage in activity as tolerated immediately after spinal fusion surgery. While the ALJ did point out that the objective evidence does reveal abnormalities, the ALJ concluded that the objective medical evidence does not support allegations that the claimant is not capable of performing light work. (R. 22).

The court finds that these reasons constitute substantial evidence to support the ALJ's determination that the claimant's subjective complaints do not warrant a disability.

---

[6] The record indicates two discontinued physical therapy orders because of the claimant's failure to attend physical therapy. Furthermore, the order form gives the referring physician the option to inform the physical therapist of limitations on lifting and/or a cardiac pulse cap; however, Dr. Noerager marked "none," implying that the claimant had no weight limitation or cardiac restrictions. (R. 1542-46).

Consequently, the ALJ properly characterized the claimant's subjective complaints in light of the objective evidence presented.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 21st day of March, 2017.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE

27